William D. Allison and Sara L. Allison v. Commissioner.
Allison v. Commissioner
Docket No. 92306.
United States Tax Court
T.C. Memo 1964-36; 1964 Tax Ct. Memo LEXIS 299; 23 T.C.M. (CCH) 199; T.C.M. (RIA) 64036; February 18, 1964
*299 Petitioner sold his insurance agency, including goodwill, records, expirations, and furniture and fixtures, for a lump-sum consideration of $24,000. The sales agreement also contained a covenant by petitioner not to compete and made provision for petitioner to render services for 11 months after the sale, but made no allocation of the purchase price as between the items mentioned. Held, no part of the purchase price was allocable to the covenant not to compete. Held, further: A part of the purchase price was allocable to the services to be rendered by petitioner. Amount determined. Petitioner's basis in the agency determined. Leland Hyzer, 2701 S. Bayshore Dr., Miami, Fla., for the petitioners. Jones E. Davis, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax for the taxable years 1957 and 1958 in the respective amounts of $4,815.46 and $176.52. The issues for decision arise out of the sale by William D. Allison (hereinafter referred to as William) of his insurance agency for a stated consideration of $24,000 in 1957. The issues are: (1) The cost basis of *300 William in the Allison and Co. insurance agency; (2) Whether $4,500 of the amounts received by William from the buyer of the agency in 1957 and $1,000 of the amounts so received in 1958 were compensation for services rendered by William, taxable as ordinary income; and (3) Whether $12,300 of the stated sales price of the agency is to be allocated to a covenant not to compete, taxable as ordinary income. Medical expense deductions in each year represented automatic adjustments and may be determined under Rule 50. Findings of Fact Petitioners are husband and wife who reside in Vero Beach, Fla. During the taxable year 1957 they resided in Pittsburgh, Pa. They filed their joint Federal income tax return for the taxable year ended December 31, 1957, with the district director of internal revenue, Pittsburgh, Pa., and their joint Federal income tax return for the taxable year ended December 31, 1958, with the district director of internal revenue, Jacksonville, Fla.
William's father had started an insurance agency known as "Allison and Co." in Pittsburgh in 1901. When William returned from service after World War I in 1919, he acquired this insurance agency from his father and *301 assumed certain of his father's obligations with regard to the agency. William's assumption of these obligations was the condition for his acquisition of the agency. At that time William's father owed a balance of $5,000 to insurance companies with which he dealt. William's father also maintained an account with an insurance brokerage firm and the balance due on this account was in excess of $4,000. William paid these obligations. In 1940, petitioner Sara L. Allison inherited some funds and William invested $4,000 of these funds in his insurance agency to be used as working capital. William operated the insurance agency in Pittsburgh from 1919 until January 15, 1957, when he had a heart attack which proved to be nearly fatal. As a result of this heart attack William was confined to his home. Prior to his heart attack William had decided to retire from the insurance business and petitioners had investigated cities and towns in Florida and had decided that they would live in Vero Beach upon William's retirement. Petitioners purchased a lot in Vero Beach prior to 1957. About mid-1956 petitioners decided to sell their home in Pittsburgh and placed a "For Sale" sign in front of their *302 house. William told persons with whom he was acquainted in the insurance business that he was considering selling his agency and he asked their advice in fixing the value of his business. He was advised that it was customary for a buyer to pay 1 1/2 to 2 times the average of the last 3 years' gross commissions for an insurance agency business. Following this advice William determined that his agency had been earning about $12,000 a year in gross commissions in each of the 3 years prior to 1957, and he placed a value of $24,000 on his agency business. William R. Sausser (hereinafter referred to as Sausser) was engaged in the insurance business in Pittsburgh in 1957. After graduation from college and after attending law school Sausser had purchased an insurance agency near Pittsburgh in 1950. Sausser learned through a mutual friend in the insurance business that William was considering selling his insurance agency. Sausser did not know William but he contacted him, introduced himself, and told William that he would like to discuss with him the purchase of his agency. In early March 1957, when William was still confined to his home after his heart attack, Sausser visited him at *303 his home and the two discussed generally Sausser's purchase of William's agency. At the meeting Sausser learned that petitioners had put their home up for sale and that William definitely planned to retire from the insurance business and move to Florida. Sausser also learned of William's heart attack and the condition of his health. William was 62 years old at this time. At a subsequent meeting of William and Sausser at William's home, the parties discussed the details of the purchase of William's business. Sausser found William's asking price of $24,000 agreeable to him on the conditions that William would assign the lease for the premises where the agency was conducted and that William would agree to introduce Sausser to policyholders and would acquaint him with the particular problems of each policyholder who did business with the agency. Under date of March 22, 1957, William, referred to as seller, and Sausser, referred to as buyer, entered into an agreement prepared by Sausser's attorney for the sale of William's insurance agency, which agreement provided in part as follows: 1. Seller agrees to sell and Buyer agrees to purchase on or before March 31, 1957 all that general *304 insurance business located at 983 Castle Shannon Boulevard, Castle Shannon, Pennsylvania, operated under the name W. D. Allison, together with but not limited thereto the good will thereof, the records thereof, the renewals at expiration of policies of present assureds thereof, all office equipment thereof, stationery and supplies thereof, the present name and combination embodying the name Allison thereof and all personal property connected therewith, as well as all rights and interests in the lease for the premises from which said general insurance business is being operated for the sum of Twenty-four Thousand ($24,000) Dollars payable as follows: Fifteen Thousand ($15,000) Dollars on or before March 31, 1957 at settlement upon delivery of a bill of sale and other documents that may be necessary evidencing title to the property purchased and the balance of Nine Thousand ($9,000) Dollars in monthly installments of One Hundred Twenty-five ( $125) Dollars commencing May 1, 1957 and continuing until said balance of Nine Thousand ($9,000) Dollars is paid in full, without interest with full right in Buyer to pay said balance at any time. * * *
4. Seller agrees that part of the consideration *305 to be paid hereunder is in return for services to be rendered by Seller in the operation of said general insurance business until March 1, 1958, unless released prior thereto by Buyer. Accordingly, Seller agrees to give his reasonable attendance and attention to said general insurance business after transfer thereof to Buyer and until March 1, 1958, and Buyer agrees to pay Seller during said period the sum of Ten ( $10) Dollars per month car allowance to July 15, 1957, and the sum of Twenty-five ( $25) Dollars per month car allowance thereafter as long as Seller devotes reasonable attention and attendance as set forth above. In the event Seller is unable to fulfill the provisions of this paragraph because of illness, death or any other circumstances whatsoever, the parties hereto agree that the balance of purchase price due Seller shall be reduced at the rate of Five Hundred ( $500) Dollars per month for each month of such default prior to March 1, 1958. It is the intention of the parties hereto that Seller will, by his services in said business, aid Buyer in becoming acquainted with the business and policyholders. 5. Seller agrees not to engage in the general insurance business *306 or any type of business competitive with the general insurance business or in competition with Buyer for a period of Five (5) years from the date hereof, within Bethel Borough and an area of Ten (10) miles from the nearest boundary line of said Borough, and further, agrees not to divulge to others any information concerning said general insurance business, except as may be necessary in the normal course of operation, unless first securing the written consent of Buyer. At no time during their discussions relating to the sale of William's insurance agency, did William and Sausser allocate any portion of the $24,000 sales price to individual items, such as furniture and fixtures, goodwill, expirations, William's covenant not to compete, or William's compensation for services to be rendered. However, in a separate instrument, termed "Bill of Sale," the stated consideration for furniture and fixtures used in William's insurance agency was $1,200. The $500 penalty clause in paragraph 4 of the agreement was inserted by Sausser's attorney but was not specifically discussed by the parties. William's physician did not permit him to leave his home until April 15, 1957, and until this date *307 he devoted no time to acquainting Sausser with the business. From April 15 to July 15, 1957, William was permitted to be away from home 1 or 2 hours each morning. Beginning July 15, 1957, William began leaving his home for several hours each day and from that time until December 1957 William spent about 3 hours per day at the agency office or calling on customers with Sausser whom he introduced to them as the purchaser of his business. He acquainted Sausser with the details of the insurance needs of each customer and on at least one occasion called upon a customer for the sale of a policy which he had negotiated prior to the sale of his agency. Petitioners were able to sell their home in Pittsburgh prior to Thanksgiving 1957 and in December William told Sausser that he was leaving the city for about 1 month to visit his children and would return in January. Sausser made no objection to William's plans. During the months of January, February, and March 1958, William devoted from 2 to 3 hours a day to the insurance business until April 1958 when petitioners moved to Vero Beach. William had agreed with Sausser that he would discharge all obligations to insurance companies as of April 1, 1957. William *308 did so and thereafter had to collect balances due from his customers for his own account. William performed these services for his own account in 1957. Under date of March 22, 1957, Sausser and William executed an agreement of partnership which provided as follows: AGREEMENT OF PARTNERSHIP Agreement made and concluded this 22nd day of March, 1957, by and between WILLIAM R. SAUSSER of Whitehall Borough, Allegheny County, Pennsylvania, and W. D. ALLISON of Bethel Borough, Allegheny County, Pennsylvania, hereinafter referred to as "SAUSSER" and "ALLISON" respectively. WHEREAS, Sausser has this day purchased and Allison has this day sold all that certain general insurance business located at 983 Castle Shannon Boulevard, Castle Shannon, Pennsylvania, operated under the name W. D. Allison, together with but not limited thereto, the good will thereof, the records thereof, the renewals at expiration of policies of present assureds thereof, all office equipment thereof, stationery and supplies thereof, the present name and combinations embodying the name Allison thereof and all personal property connected therewith, and inter alia Sausser agreeing to pay a portion of the purchase price *309 to Allison in future installments. WHEREAS, Sausser and Allison, in an effort to minimize the loss of good will which may result from changing over said business from sole ownership in Allison to sole ownership in Sausser desire to form a partnership. WHEREAS, Allison has agreed to render reasonable attendance and attention to said business until March 1, 1958, unless sooner released from said obligation by Sausser; and, WHEREAS, pursuant to the provisions governing the sale of said business by Allison to Sausser, the parties hereto desire to become partners in the operation of said general insurance business upon the following terms and conditions. NOW THEREFORE, in consideration of the mutual promises herein contained and intending to be legally bound thereby, the parties agree that: 1. The name of the partnership shall be W. D. Allison. * * *
4. The capital of the partnership shall consist of all of the property purchased by Sausser from Allison, more generally described hereinabove, said property having a value of Twenty-four Thousand ($24,000) Dollars, together with the sum of One Thousand ($1,000) Dollars cash, all of which is contributed by Sausser. 5. The *310 parties hereto agree that Sausser will have an interest of Ninety-nine (99%) per cent in said partnership, and Allison will have an interest of one (1) percent in said partnership. 6. The net profits of the partnership shall be distributable Ninety-nine (99%) per cent thereof to Sausser and one (1%) per cent thereof to Allison. Further, as regards the percentage of net profits distributable to Allison, the car allowance hereinafter provided for shall first be deducted from said one (1%) per cent net profits. 7. The net losses of the partnership shall be chargeable exclusively to Sausser. 8. Both Sausser and Allison shall give reasonable attendance and attention to said general insurance business and to the affairs of the partnership. The management and conduct of the partnership business shall be discussed and decided upon by the partners. However, in the event of disagreement between the partners, all decisions on matters not specifically provided for in this agreement shall be made by Sausser. 9. Allison shall be paid by the partnership a car allowance of Ten ( $10) Dollars per month to July 15, 1957, and Twenty-five ( $25) Dollars a month thereafter during the existence *311 of the partnership. This car allowance shall be paid irrespective of whether or not one (1%) per cent of the net profits of the partnership is sufficient to cover the same. * * *
IN WITNESS WHEREOF the parties have hereunto set their hands and seals the day and year first above written. WITNESS: /s/ William D. Allison /s/ Sara L. Allison /s/ William R. Sausser (SEAL) / William R. Sausser /s/ W. D. Allison (SEAL) / W. D. Allison Partnership returns, Form 1065, were filed for the W. D. Allison and Co. partnership for the taxable year 1957 and 1958. A deduction for amortization was claimed on the partnership returns in each year for William's covenant not to compete which was reported to have a cost basis of $15,800 and was reported as amortizable over a 5-year period. On the partnership return for 1957 a deduction of $4,500 was claimed for "Personal service rendered" which was explained on the return as William's services rendered pursuant to his agreement as part of the consideration for sale of the business. A similar deduction for personal services rendered in the amount of $1,500 [1] was claimed on the partnership return for 1958. *312 It was reported on the partnership return for 1957 that William devoted 100 percent of his time to partnership business; on the partnership return for 1958 it was reported that William devoted no time to partnership business. In the statutory notice of deficiency respondent determined that the $24,000 sales price of the Allison and Co. agency should be allocated as follows: Furniture and fixtures
$ 1,200
Goodwill
5,000
Salary: 1957
$4,500
1958
1,000
5,500
Covenant not to compete
12,300
Total
24,000
Sales price of business allocable to: Furniture and fixtures
$ 1,200
Goodwill
5,000
Less adjusted basis of furniture &
fixtures
(1,000)
Gain realized
5,200
50% to be taken into account
2,600
The cost basis of William in the Allison and Co. insurance agency in 1957 was $10,000, which amount consisted of $1,000, representing the adjusted basis of furniture and fixtures; $5,000, representing William's assumption and payment of his father's obligations to insurance companies, and $4,000, representing William's assumption of his father's obligations to the insurance brokerage firm when he acquired the agency from his father *313 in 1919. The value of the services rendered by William to the agency after April 1, 1957, was $800 in 1957 and $400 in 1958. Such amounts were received by William from the buyer of the agency in those years as compensation for services. No part of the selling price of the agency was separately negotiated or attributed to the covenant not to compete. Opinion The first issue is concerned with William's cost basis in his insurance agency which he sold to Sausser in 1957. On their return for 1957 petitioners reported that William's basis for the business was $20,000; but on brief they contend that this cost basis was $19,000, consisting of the amounts of $1,000, representing the adjusted basis of furniture and fixtures; $5,000 and $4,000, representing obligations of William's father to insurance companies and an insurance brokerage firm, respectively, which William assumed in 1919 and later paid; $5,000, representing personal obligations of his father which he assumed; and $4,000, which William invested in the business in 1940. Respondent determined that the cost basis of the agency was no more than $1,000, representing the adjusted basis of furniture and fixtures. The issue *314 is strictly one of fact and turns upon whether the evidence adduced by petitioners covincingly sustains their contentions. While petitioners' evidence on this issue is not supported by the documentary evidence that would be preferable, we recognize that the events occurred many years ago and may not be susceptible of such substantiation. Nevertheless, we believe William's testimony and accept it as proof that he did in fact assume certain obligations of his father in order that he might take over and continue his father's insurance agency business, and that he paid these obligations. These business obligations consisted of the $5,000 owed to the insurance companies which William continued to represent and the $4,000 owed to the brokerage firm whith which William continued to do business. The assumption and payment of these obligations was a part of William's investment in the business. While we do not disbelieve William's testimony that he also paid certain personal obligations of his father after he took over the business and that he put $4,000 into the business in 1940 as working capital, we do not think these items can be added to his cost of the agency. With respect to the *315 personal obligations of his father, there is no evidence that they were in any way related to the business, or that William had to assume and pay them in order to take over and continue the business. It is understandable and logical that William would have had to pay off the business debts in order to continue the business but, in the light of the rather meager evidence, we are not convinced that his payment of his father's personal obligations was a part of the price he paid for the business. With respect to the $4,000 William testified he invested in the business in 1940 for working capital, we do not believe it can be considered a part of his cost basis in the agency. The evidence indicates that there were no bank accounts, cash, prepaid expenses, receivables, etc., transferred to Sausser. The only things transferred were the furniture and fixtures, presumably William's files, and goodwill. If $4,000 in cash was put into the business it must either have been taken out of the business by William prior to or at the time of the sale or have been exhausted by operating expenses which would have offset operating income of the business for income tax accounting purposes. In any event *316 we were furnished no accounting with respect to this sum and in a proprietorship with no tangible assets in which it could be represented, we cannot agree that it is to be added to William's cost basis in the agency. We therefore have concluded that William's cost basis in the business sold was $10,000, consisting of a $1,000 basis in the furniture and fixtures, about which there is no disagreement, and the total of $9,000 in the obligations of the business when William took it over from his father in 1919. The remaining two issues are concerned with allocating the sales price of the business between items which are taxable as ordinary income and items which are taxable as capital gain to the seller. Petitioners contend that they are entitled to treat as proceeds from the sale of a capital asset the entire $24,000 which was the stated consideration for the sale of William's insurance agency to Sausser. Respondent has determined that of this $24,000, the amount of $12,300 is properly allocable to a covenant not to compete, and the amount of $5,500 represents compensation to William for personal services rendered to Sausser, and that these amounts constitute ordinary income to *317 petitioners in 1957 and 1958. In the sales agreement executed March 22, 1957, the pertinent parts of which are recited in our Findings of Fact, William agreed to sell, and Sausser agreed to buy, the insurance agency business, including goodwill, furniture and fixtures, and expirations, for $24,000. William agreed that he would not compete with Sausser within a defined area for 5 years, and that he would perform services for Sausser in the insurance agency business until March 1, 1958. There was no breakdown of the total sales price among the various items mentioned and very little evidence that such a breakdown was discussed in the negotiations. However, William did execute a bill of sale to Sausser for the furniture and fixtures in which the consideration for these assets was stated to be $1,200. The partnership under which the agency was operated after April 1, 1957, claimed a deduction for amortization of the cost of William's covenant not to compete [2] and for amounts paid to William for services rendered, at $500 per month. Any portion of the stated consideration paid William which represents payments *318 for a covenant not to compete must be deemed ordinary income to petitioners. ; ; . Furthermore, any portion of the stated purchase price which represents, in fact, compensation for the rendition of personal services by William must be treated as ordinary income by petitioners. , affd. (C.A. 9, 1962); cf. . The problem of whether a portion of a stated sales price for a capital asset is to be apportioned to a covenant not to compete is a familiar one. In such cases it is generally to the advantage of the seller to have none of the stated price so allocated; there is at least a motive for the buyer's wishing such an allocation to be made in order that he may be entitled to a deduction for amortization of the price which he has paid for the covenant. Compare , *319 affd. (C.A. 10, 1954), with , affd. (C.A. 10, 1954). The question in these cases is to determine whether the covenant may be severed from the transfer of goodwill and was separately dealt for by the parties. The rule has been stated in , to be: If such an agreement can be segregated, not so much for purposes of valuation as in order to be assured that a separate item has actually been dealt with, the agreement is ordinary income and not the sale of a capital asset. . But where it accompanies the transfer of good will in the sale of a going business and it is apparent that the covenant not to compete has the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which he has acquired, the covenant is regarded as nonseverable and as being effect a contributing element to the assets transferred. ; . In the instant case we have had the benefit *320 of the testimony of both William and Sausser. William has stated unequivncally that at no meeting with Sausser was any value placed upon the covenant not to compete; undeniably none was stated in the agreements which they executed in March 1957. Sausser has testified that he would not have purchased the business without William's covenant not to compete. However, there can be no doubt that Sausser's principal objective was to obtain the goodwill which attached to William's business which had been conducted in Pittsburgh since 1901; that is, Sausser wanted to be able "to succeed to the advantageous position of his predecessor." See . Sausser not only contracted specifically to purchase goodwill, but he entered into the partnership agreement with William for the recited purpose of assuring that he would be able to retain it. But William had dealt with his customers on a personal basis, and it does not appear that William had any employees to sell policies; he handled sales himself. The sale of goodwill by William, together with expirations which are intangibles in the nature of goodwill, see ; *321 , would have been meaningless without William's promises not to compete with Sausser and to cooperate with Sausser in acquainting him with customers' policies and needs and to introduce him to Williams' customers as the purchaser of the business. The evidence shows that Sausser wanted the acquisition to work the slightest change possible; the name "Allison" was to be kept and William was to continue dealing on a personal basis with the customers, advising them that Sausser was the new purchaser. Sausser was also fully aware of the fact that William intended to and had made plans to retire and move to Florida so that there was little danger of competition from William after the change in ownership had been completed in the manner contemplated. In other words, William's covenant not to compete was an integral part of the transfer of goodwill. ; ; . It was nonseverable from the goodwill which was the primary asset sold by William. The instant situation is to be contrasted with those cases involving taxpayers *322 who have sold capital assets and have agreed not to compete with the purchaser when they have had no proprietary interest in the goodwill of the business. See, e.g., , affd. (C.A. 2, 1995). It is also to be contrasted with the situation in which the covenant not to compete is clearly severable from goodwill. See, e.g., We hold that no part of the stated sales price of $24,000 is to be allocated to the covenant not to compete. But we must consider also whether any portion of the purchase price is to be apportioned to compensation for personal services to be rendered by William. Petitioners contend that in view of his physical condition Sausser could not reasonably have expected that William would perform services of any value. On the other hand the parties specifically contracted for the rendition of services by William for a specified period of time, it seems clear that Sausser was anxious to have whatever help William was physically able to provide during the the transition period, and William recognized this obligation by rendering what services he could during *323 the specified period, which were undoubtedly of some value to Sausser. It is true that William's services could be said to be incidental to the transfer of the goodwill, but the sales agreement specifically stated that a part of the consideration to be paid thereunder was in return for William's services. In our view the fact that the services were to be rendered incidental to the transfer of goodwill makes the compensation therefor no less taxable as ordinary income than if they had been rendered under other circumstances. Under the circumstances here present we hold that a part of the consideration paid by Sausser to William was for William's services to be performed during the succeeding 11 months and that the portion properly attributable thereto is taxable as ordinary income to William. We must therefore determine what portion of the total consideration was properly attributable to William's services. The sales agreement does not specifically provide what part of the consideration was to be in return for William's services. The partnership deducted $4,500 on its return for 1957 and $1,500 on its return for 1958 for personal services rendered under paragraph 4 of the sales *324 agreement, and respondent determined that $4,500 of the amount received by William in 1957 and $1,000 of the amount he received in 1958 under the sales agreement was taxable to him as salary. Both of these determinations were obviously made because of the provision in paragraph 4 of the sales agreement that "In the event Seller is unable to fulfill the provisions of this paragraph because of illness, death or any other circumstances whatsoever, the parties hereto agree that the balance of the purchase price due Seller shall be reduced at the rate of Five Hundred ( $500) Dollars per month for each month of such default prior to March 1, 1958." William testified unequivocally that the parties did not negotiate over the compensation he was to be paid for his services. Sausser testified that the matter was discussed but not that the amount was agreed upon. The above provision was put into the agreement by Sausser's attorney. William said he accepted the provision for reduction of the purchase price simply as a provision for liquidated damages for failure to transfer the goodwill in the manner contemplated. Under the circumstances present we think such was the purpose of the quoted provision *325 rather than an agreement fixing the compensation to be paid for William's services. At the time the agreement was made it was obvious, because of his heart condition, that William would not be able to render any appreciable services for some time and only limited services thereafter. He was not expected to seek new business but only to aid Sausser in becoming acquainted with the agency business and present policyholders. It was also understood that William would have to spend some of his time collecting on policies previously written for his own account, which he did. William's testimony, which is uncontradicted, was to the effect that the average gross income of the agency during the past 3 years had been about $12,000 per year and the average net income about $6,000 per year, or $500 per month. It is not reasonable to believe that Sausser would have been willing to pay William the entire net income of the agency that could be anticipated from past performance for the relatively minor services he could be expected to perform for Sausser. We think the $500 penalty clause was inserted in the agreement to assure that William would remain in the Pittsburgh area for consultation, etc. *326 , until a reasonable transition period had elapsed, and was not intended to fix the value of William's services. We therefore conclude that respondent's determination, based as it was on the $500 penalty provision, is not entitled to the presumption of correctness. There being no compensation specified for William's services, we are forced to determine from the evidence available how much of the consideration to be paid under the contract should reasonably be attributable to the services William actually performed. Based on all the evidence available we are of the opinion, and have so found as a fact, that the value of William's services rendered for the agency during the year 1957 after April 1 was $800 and that the value of his services rendered in 1958 was $400. Consequently those amounts of the total consideration received by William in the years 1957 and 1958, respectively, will be taxable to William as compensation for services rendered. Decision will be entered under Rule 50. Footnotes
1. Apparently the deduction claimed for 1958 was $1,500 rather than $1,000 because, although the contract provided for William's services only to March 1, 1958, William actually rendered some services to the agency until April 1958 when he moved to Florida.↩
2. The cost of $15,800 representing an estimate by Sausser's accountant.↩